IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 7, 2023 Session

## STATE OF TENNESSEE v. CHRISTOPHER BOLDEN

**Appeal from the Criminal Court for Shelby County
Nos. 18-07054, C1810335    J. Robert Carter, Jr., Judge**

_____

## No. W2022-01127-CCA-R3-CD

_____

A Shelby County jury convicted Defendant, Christopher Bolden, of especially aggravated robbery, for which he received a sentence of twenty years' incarceration.  On appeal, Defendant contends that: (1) the trial court erred in denying his motion to dismiss the indictment for lack of a speedy trial; (2) the trial court erred in denying his motion for severance of his case from that of his co-defendant; (3) the trial court erred in "curtailing [Defendant's] questions in jury selection"; (4) the trial court erred in denying Defendant's request to cross-examine the victim about "potential bias" related to cases that the State dismissed against the victim while Defendant awaited trial; (5) the trial court erred in admitting Defendant's prior conviction for robbery "without engaging in the required analysis"; (6) the trial court erred in allowing the State to ask questions about "an irrelevant and prejudicial rap music video"; (7) the trial court erred by refusing to fully bifurcate a charged count of convicted felon in possession of a firearm from all other counts; and (8) the evidence was insufficient to support his conviction.  Following a thorough review, we affirm Defendant's judgment of conviction.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Phyllis Aluko, District Public Defender; and Glover Wright and Katherine Oberembt, Assistant District Public Defenders, for the appellant, Christopher Bolden.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Matt McLeod, Brad Reasonover, and Forrest Edwards, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

### *Pretrial Proceedings*

On July 2, 2018, Sebastian Parker was shot and robbed at a recording studio he owned in Memphis. Mr. Parker later identified Defendant and his co-defendant, Corey Brown, as the assailants.

Defendant was arrested for his involvement in the offense on September 6, 2018.[1] The Shelby County Grand Jury issued an indictment on December 4, 2018, charging both Defendant and Co-Defendant Brown with attempted first degree premeditated murder, especially aggravated robbery, employing a firearm in the commission of a dangerous felony, and convicted felon in possession of a firearm. Defendant was arraigned in Criminal Court on January 4, 2019, and the Shelby County District Public Defender's Office was appointed to represent Defendant. In June 2019, the first Assistant District Public Defender assigned to Defendant's case filed multiple pretrial motions on Defendant's behalf, including a Motion for List of State's Witnesses; Motion to Suppress Out-of-Court Identification; Motion to Bifurcate Count Four (Convicted Felon in Possession of a Firearm); and a Motion for a Rule 609 Hearing.

On August 8, 2019, Defendant appeared in court with a second Assistant District Public Defender ("defense counsel"), who made the following announcement: "I have now had an opportunity to meet [Defendant] and go over discovery, and after meeting with him, he would like to set another trial date. I've spoken with the State, and I think we are both free on October 7th." When defense counsel requested a motion date, the trial court commented, "It's been set for trial before. I assume we heard all the motions we needed to hear. In fact, we did hear some motions. But if you filed some and there's a good cause shown, I'll give you a motion date[.]" On September 5, 2019, the State filed a Notice of Impeachment Convictions and Notice of Intent to Seek Enhanced Punishment.

On September 10, 2019, Defendant filed pro se a Motion to Relieve Counsel of Duties, along with several additional pro se motions. At a status hearing held September 12, 2019, Defendant asserted that he did not want to be represented by defense counsel and that he wanted to represent himself. When the trial court attempted to question Defendant about his decision, however, Defendant refused to answer the court's questions. Defense

---

[1] We glean the date of Defendant's arrest from the dates of Defendant's pretrial jail credits on his judgment of conviction; the record on appeal contains no information about pretrial proceedings occurring between the time of Defendant's arrest and his indictment.

counsel requested a mental evaluation for Defendant, but the trial court denied the request, stating: "At this point, no. I'm sorry. It would just be delay. They wouldn't get it done. You have not felt the need to have him mentally evaluated until this last tack. And I'm going to call it a behavioral choice that [Defendant's] making[.]" On September 17, 2019, defense counsel filed an "omnibus motion" on Defendant's behalf, containing thirteen new or amended pretrial motions.

On October 3, 2019, Defendant filed a pro se Motion for Continuance, asserting, in part, that he had requested for his attorney to hire a ballistics expert and a private investigator to assist in his case but that his attorney had not done so. Defendant averred that he filed a Motion to Relieve Counsel of Duties due to the ineffectiveness of his attorney, and Defendant objected to "being forced to trial October 7, 2019[.]" During a court appearance on October 7, 2019, Defendant requested that his trial be continued because the parties did not yet have the results of a ballistics test conducted by the Tennessee Bureau of Investigation (TBI); the trial court granted Defendant's request for a continuance and reset his case for trial on December 9, 2019.

On December 6, 2019, the State filed a Motion for Severance of Defendants for a Fair Determination, in which it requested that Co-Defendant Brown's case be severed from that of Defendant's due to Defendant's behavior. The State asserted in its motion:

> 1. [Defendant] has exhibited erratic behavior during the pendency of this case. Prior to being represented by [defense counsel], [Defendant] issued inappropriate written communication to a previously appointed attorney which resulted in the Court relieving that attorney from the case on May 6, 2019.

> 2. On September 27, 2019, [Defendant] informed the Court that he wished to represent himself due to dissatisfaction with his appointed attorney. As the Court attempted to advise [Defendant] of his rights and the dangers of proceeding pro se, [Defendant] became highly argumentative and repeatedly interrupted the Court. [Defendant] became so agitated that he refused to cooperate with the Court's required inquiry as to his ability to represent himself.

> . . . .

> In light of [Defendant's] repeated misbehavior and disrespect to the Court, it is likely that those incidents will occur again at a jury trial. Such disruptive actions have the significant potential to negatively impact jurors' views of . . . [Co-Defendant Brown]. Failure to sever [Defendant's] and [Co-

Defendant] Brown's cases would likely result in severe prejudice to the State's and [Co-Defendant] Brown's right to a fair determination of the guilt or innocence of [Co-Defendant] Brown.

On the morning of December 9, 2019, the trial court heard several pretrial motions, including Defendant's Motion to Bifurcate Count Four (Convicted Felon in Possession of a Firearm); Motion for Rule 609 Hearing; and a Motion in Limine to Exclude Prejudicial Music Video. Regarding the issue of the admissibility of Defendant's prior convictions for impeachment purposes under Tennessee Rule of Evidence 609, the trial court ruled that Defendant's previous conviction for assault did not qualify as an impeaching offense. As for Defendant's prior conviction for robbery, the trial court stated:

[N]ormally, it qualifies as a crime of dishonesty. It's a felony. It would certainly qualify. I have to . . . weigh the situation. And I think I probably would hold off on that and see how the proof came in.

The caselaw tells me that in some cases like a person's credibility is much more a determiner in other cases and, you know, I look at it a little differently depending on how the proof would unfold. So I don't want to just blanket say, yes, it comes in. I mean, it qualifies as an impeachable offense, but I would be watching to make sure that it wasn't unduly . . . prejudicial[.]

. . . .

The robbery qualifies as an impeaching conviction, but I'm going to watch how the proof unfolds. It may be too close or too similar to this one to be allowed, or it may not. And under the circumstances, I will make that ruling as the proof unfolds.

Prior to taking a recess to view the music video that was the subject of Defendant's motion in limine, the trial court noted that Co-Defendant Brown had requested a continuance[2] and that the court had granted the continuance because Co-Defendant Brown's mental evaluation had not yet been completed. The court noted that he had signed an order for a recommended thirty-day mental evaluation of Co-Defendant Brown but that it was unaware when Co-Defendant Brown would be "shipped" for the evaluation.

---

[2] The record on appeal does not contain Co-Defendant Brown's motion for continuance, and it is unclear whether the trial court granted Co-Defendant Brown's motion for continuance on the morning of December 9, 2019, or sometime prior. We note, however, that defense counsel appeared unaware that a motion for continuance had been filed by Co-Defendant Brown. Moreover, the trial court commented that the motion had not "made its way into the [court's] jacket" by the morning of December 9.

- 4 -

Regarding the issue of the State's Motion for Severance of Defendants, the trial court stated:

> I understood the State's concerns in terms of severance, and I shared them, frankly, because I wasn't really clear what to do with that.
>
> But -- and what we're talking about, [Defendant], is if you were going to try to represent yourself, there -- people who represent themselves generally do such a bad job of it, that not only is it bad for them, but it's bad for their co[-]defendant who didn't choose that, you know, who is represented by an attorney. So I was content to separate your cases when you were going to try to represent yourself.
>
> If you're going to work with your attorneys, then I'm kind of back to thinking that it might be more -- make more sense to try these all together on that matter.

After the court's recess, defense counsel stated that Defendant "would like to go forward" because of his right to a speedy trial. The trial court stated, however, that it intended to try Defendant and Co-Defendant together. The court explained, "[T]he law tells me I have to try [co-defendants] together unless there's a good reason. And right now I haven't seen a legal reason to sever you." The following exchange then took place:

> [Defense counsel]: [J]ust for the record, as I told the Court -- [Defendant's] here. We do object to the Court's continuing the case. [Defendant] is asserting his right to a speedy trial in this instance. He is prepared to go forward today as are we.
>
> [Trial court]: All right. And this case was reset the last two times at [Defendant's] request and so I'm going to grant this. It's really a -- the Court's order to reset it because of the unavailability of the co[-]defendant. And for that reason, I'm going to deny it. Now [on the reset date], if the -- [Co-Defendant] Brown's off in the mental hospital or something, then I think speedy trial would kick in more and I'd be prepared to sever, because I'm not going to hold you forever to -- while [Co-Defendant] Brown gets straightened out. But I think that this one resetting is mandated by the proof as it's unfolding here.

The trial court reset Defendant's case to February 24, 2020, and stated that, if Co-Defendant Brown was not available for trial that day, the court would "revisit the motion to sever."

- 5 -

On February 24, 2020, the following exchange occurred before the trial court:

> [Defense counsel]: Good morning, Your Honor. I just need to check in on a trial.
>
> [Trial court]: Well, I think we've at least figured out in no small part, due to your casual comment on Friday, why [Co-Defendant] Brown has not been -- we don't have a report on him. He hasn't been sent, and that's because he wasn't ordered. So I think that's the situation we find ourselves in. I'm going to probably reset this one time to try to try these together. If [Co-Defendant] Brown is not able to be tried together, then I -- you know, we simply can't keep putting that off on this.

While the court addressed other docketed matters, Defendant filed a Motion for Severance, in which he averred that he "wishe[d] to be tried forthwith" and asserted his right to a speedy trial. The trial court denied the Motion for Severance but stated, "[I]t's not a permanent and universal denial. I think what we're going to do is set this for a trial. And if on the next setting [Co-Defendant] Brown is unavailable or unable, I just wouldn't be able to refuse to grant that anymore." The court stated that,

> under the circumstances as I have them, in reviewing the records on [Co-Defendant] Brown, I'm a believer in [thirty] days he'll be ready for trial. So . . . my experience and the report that I got, and it should've been done. It -- like I said, an order was not entered. The reason he's not ready for trial today is he hasn't been for his [thirty]-day evaluation, which should've been done.

The court stated that it intended to have Co-Defendant Brown transported for his mental evaluation "quickly." After consulting with counsel for Defendant and Co-Defendant Brown regarding their schedules, the trial court reset the matter for trial on April 13, 2020.

As acknowledged by Defendant, by April 13, 2020, the Tennessee Supreme Court had suspended all in-person courtroom proceedings, which included jury trials. *See In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Mar. 13, 2020) (Order). Pursuant to subsequent Supreme Court orders, jury trials remained suspended through July 3, 2020, so the trial court reset the case for report dates on April 13, 2020, May 18, 2020, June 15, 2020, and July 2, 2020. *See In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Mar. 25, 2020) (Order); *In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Apr. 24, 2020) (Order); *In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. May 26, 2020) (Order).

On the July 2, 2020 report date, Defendant requested a bond reduction. The trial court granted the request, reducing Defendant's bond to $200,000. In addressing the issue, the trial court commented on the reasons for the delay in Defendant's trial. The court stated:

[Defendant] was very erratic and -- and his behavior has given me great question over the period of time. I -- but I will recognize in the last several months I have not experienced that.

. . . .

This case has taken longer than I believe a criminal trial should take for reasons that are outside of all of our control.

The . . . COVID-19 virus has not allowed us to safely, legally, and appropriately try his case. He's got a co[-]defendant who's got some possible mental issues that has also contributed to delaying [Defendant's trial]. Those are not [Defendant's] fault[.]

. . . .

[T[hough he requested early continuances, but that's neither here nor there. He didn't ask for it to be set this long.

So having said that, that's the one change in circumstance that I can see only. It's still a very serious, serious matter. I've heard motions on it so I'm -- heard the allegations. Anyway, I'm not making a decision on whether they're accurate or not, but the -- but there is substantial proof that if a jury accredits it that [Defendant] is facing a significant amount of time if . . . a jury accredits that proof.

Defendant's case was reset to July 29, 2020. On that date, Defendant again requested a jury trial. The trial court observed that the COVID-19 global pandemic had been difficult for everyone but that the court was "not standing out and deciding that . . . [Defendant] doesn't get a trial." The court said that it was "hopeful" that a safe procedure for conducting trials would have become "apparent" but that it had not. The court reset the case for August 26, 2020.

On August 26, 2020, the court asked if September 29, 2020, was a suitable date for the parties, and Defendant agreed that it was. On September 29, 2020, the parties again discussed setting a date for trial. Acknowledging that the pandemic made it difficult to

schedule trials, the trial court stated that it did not "know what we're going to do" but suggested October 30, 2020, as a new court date, to which Defendant agreed. On October 30, 2020, Defendant agreed that December 9, 2020, was an acceptable court date. However, Defendant reiterated that he was seeking a trial "as quickly as possible." The trial court observed that it was not Defendant's fault that the court had not yet been able to schedule a trial.

On November 17, 2020, the Supreme Court issued an order suspending all jury trials through January 31, 2021, due to the "significant increase in the number of Covid-19 cases in Tennessee[.]" *See In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Nov. 17, 2020) (Order). Accordingly, on December 9, 2020, the trial court reset Defendant's case for January 27, 2021, and acknowledged Defendant's request for a trial. The court noted that Health Department and Supreme Court orders would dictate when it could schedule a trial and observed that "a two co[-]defendant trial is not imaginable in these circumstances."

On January 27, 2021, the trial court reset the case for March 31, 2021, noting that it could not currently schedule jury trials under the Supreme Court's orders. *See id*; *In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Jan. 15, 2021) (Order). During the March 31, 2021 hearing, the trial court reset the case for April 28, 2021; the court later set the case for May 7, 2021. On May 7, 2021, the court rescheduled the case for June 23, 2021. During the hearing, defense counsel asked if the trial court was giving trial dates currently, and the court stated that it was not setting cases for trial that involved two co-defendants who were in custody. The court advised, however, that "the Shelby County Health Department is supposed to pronounce on something midweek next week." The court stated that Defendant had not been scheduled for trial due to COVID-19 and the Supreme Court's orders. The court stated that "as soon as we're safely able to try [cases], we will accommodate [Defendant's] rights."

On May 14, 2021, the Supreme Court issued an order in which it noted that the suspension of all jury trials was lifted on March 31, 2021, but that the Court "continued to grant discretion to all judicial districts to conduct in-person court proceedings in accordance with this Court's prior orders and the approved comprehensive written plans for each judicial district." *In re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. May 14, 2021) (Order). The order modified its previous requirement of six feet of distance between persons in the courtroom to a requirement of three feet of distance between persons in the courtroom. The order also lifted previous "courtroom capacity requirements" but noted, "Judges retain the discretion to limit the number of people in a courtroom as health and safety conditions or circumstances necessitate while ensuring the courts remain open and accessible."

On June 23, 2021, the trial court reset the case for June 24, 2021, because Co-Defendant Brown's counsel was not present. On June 24, 2021, the trial court reset the case to November 18, 2021.[3]

On November 10, 2021, Defendant filed a Motion to Dismiss or, in the Alternative, Release Defendant on His Own Recognizance for Lack of a Speedy Trial. The next transcribed hearing date in the record is from January 10, 2022. At this hearing, defense counsel noted that he had filed a motion to dismiss for lack of a speedy trial, but he acknowledged that he was "bound by the order saying there are no trials this month." The trial court stated that it would give Defendant the next available trial date. Defense counsel stated that he had three "out-of-custody" trials scheduled for February 2022, and the court noted that an additional trial was scheduled for the date of one of defense counsel's trials. The court suggested April 18, 2022, as a trial date, but defense counsel explained that he had two trials previously scheduled for that date. After accommodating scheduling conflicts for Defendant's and Co-Defendant Brown's counsel, the trial court set a trial date for May 9, 2022. Defendant reiterated his motion to dismiss, and the trial court stated that it was not going to dismiss the case because the court had "a COVID mandate that says we're not to have a trial." The trial court stated that it wanted to get Defendant's case tried but that it was "not finding [the delay] to be the fault of the State or the defense." The court opined that "we're all ready but for the fact that we have an Omicron variant that has" a high infection rate. The court observed that "we have a courtroom that's the size of a -- slightly larger than the back of a station wagon," along with six attorneys and two clients "sitting in a space, [fifty]-something potential jurors, in addition to the courtroom staff. I just don't see how we can get it done."

On February 16, 2022, the Supreme Court issued an order eliminating its prior distancing requirements between persons in the courtroom. *See In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Feb. 16, 2022) (Order).

During the May 9, 2022 setting, the trial court explained that it was "having some difficulties" with Co-Defendant Brown because Co-Defendant Brown did not want to attend trial. The trial court raised the issue of severing the co-defendants for trial, but defense counsel stated that he was anticipating Defendant's being tried with Co-Defendant Brown and that Defendant would want a short continuance if the co-defendants were not tried together. The trial court then indicated it would use the Detention Response Team (D.R.T.) to escort Co-Defendant Brown to court. Ultimately, the trial court, with Defendant's agreement, continued the case until the following day. The court also issued

---

[3] On November 18, 2021, there was no recording of an announcement on Defendant's case, other than the docket call.

an order for the D.R.T. to bring Co-Defendant Brown to court and "remain with him at all times during his court appearances."

Defendant and Co-Defendant Brown were tried jointly before a jury on May 10-13, 2022. On the morning of trial, Defendant filed a Motion in Limine to Allow Cross-Examination on Alleged Victim's Prior Dismissed Cases. In the motion, Defendant alleged that Mr. Parker had been charged with domestic assault on February 21, 2019, and that Mr. Parker successfully completed judicial diversion, resulting in the dismissal of the charge on October 15, 2021. Defendant further alleged that Mr. Parker had been charged with misdemeanor failure to appear on February 21, 2019, but that the charge was later dismissed on July 11, 2019. Finally, Defendant alleged that Mr. Parker was charged with unlawful possession of a weapon on June 26, 2021, but that the State announced a nolle prosequi on the charge on September 29, 2021.

Prior to the start of trial, defense counsel announced:

I had filed a motion this morning to allow the defense to cross-examine the alleged victim, Sebastian Parker on three cases that had been dismissed during the pendency of this case, and we had a discussion about that off the record, and it's fair to say that Your Honor denied that motion.

The trial court responded, "Yes. But I . . . barring, something you can show me, you know, dismissed cases would not be impeachment material."

### *Voir Dire*

During voir dire, defense counsel questioned potential jurors about "what it feels like to be in fear and how it affects" them and asked if any of the potential jurors had experienced a situation that caused them to fear for their lives. One potential juror, Mr. Bullard, discussed an incident in which he had a gun pointed in his face. Defense counsel asked questions that elicited multiple responses regarding the incident, including Mr. Bullard's own experience with the criminal justice system. After asking Mr. Bullard if authorities apprehended his assailant, Mr. Bullard said that it was "an interesting story" and began to recount it. While assuring Mr. Bullard that it believed that it was "an interesting story," the trial court stated that it was not sure that it was "an interesting story for today." After defense counsel stated that she could "move on," the trial court explained that "we all have these experiences, and we're trying to compartmentalize them, but we don't need to share them with everyone." In additional questions to Mr. Bullard, defense counsel elicited several responses about how he was not involved in the prosecution of his assailant and was not happy to be excluded from participation in the prosecution. At this point, the trial court asked defense counsel to "move on" because it did not want to bring

- 10 -

up other "criminal case experiences[,]" explaining to the jury that "we want to try this case with the evidence that comes in from this witness stand and the law I give you and not how some other case was handled or could have been, should have been, [or] might have been handled."

In additional questioning of the potential jurors, defense counsel asked if they had any issues or disagreed with the instruction that it could not hold it against Defendant if he chose not to testify. Defense counsel asked if anyone "strongly agree[d] that an innocent person charged with a crime should want to testify on his own behalf," several jurors indicated a belief that an innocent person would wish to testify in his or her defense and that there was a presumption that a defendant who did not testify was guilty. At this point, the trial court instructed potential jurors that, under the law, the "presumption is exactly the opposite" and that Defendant was "under no obligation to prove a thing." The trial court further explained that jurors could not draw any inference from a defendant's choice not to testify. When defense counsel continued the line of inquiry, one potential juror, Ms. Parks, indicated that it would be difficult for her to find Defendant not guilty if he did not testify. After the trial court explained the role of the jury and asked if potential jurors could follow the law "and be fair," Ms. Parks responded affirmatively.

### State's Proof

Sebastian Parker testified that, in July 2018, he owned a recording studio on Dudley Street in Memphis. Mr. Parker explained that the recording studio was housed in a two-story building, with the ground floor containing a tow truck company and a bathroom and the second floor his recording studio, which consisted of an engineering booth and a recording booth and was accessed by a flight of stairs. Mr. Parker stated that the recording studio was located less than a minute away from the Crump Station police precinct of the Memphis Police Department (MPD).

Mr. Parker testified that on July 2, 2018, he arrived at the recording studio around noon and that he received a phone call from Co-Defendant Brown, whom Mr. Parker knew as "Goon Carleon." He said that Co-Defendant Brown wanted to schedule an appointment for an hour of recording time that day. Mr. Parker said that Co-Defendant Brown had used his recording studio three or four times previously. Co-Defendant Brown arrived around 12:40 p.m. along with a man that Mr. Parker did not know but later identified as Defendant. Mr. Parker explained that he had a surveillance system set up to record the outside entry to the building. Mr. Parker testified that, when Defendant and Co-Defendant Brown arrived, he let them into the locked door at the front of the building. He said:

> Well, I let them in. We went up the steps to the recording studio, and
> when we got upstairs, [Defendant] . . . asked could he go to the bathroom and

- 11 -

where was it. I told him yes, and it was downstairs to the right. So [Defendant] went to the bathroom.

. . . .

So when [Defendant] c[a]me back up the steps, I had heard the steps. They wooden. So I turned around like to the doorway, and that's when [Defendant] had the gun with the beam pointed at me. He said, n***a, you know what time it is. So I threw my hands up, and [Co-Defendant Brown] was right beside me. He hit me across the head with the gun, and I fell to my knees and he shot twice, pow, pow. It went through my leg. I fell on my face, and both of them came over me. They flipped me over, went in my pockets, got my money, my credit card, my bank card, and my keys and my phone, and that's when [Defendant] . . . he ran downstairs. I guess he was trying to get out the door, and while he was down there trying to get out the door, [Co-Defendant Brown] was running around trying to find the surveillance box, the DVR, the digital recording box that the camera go to, he was trying to find the camera box[.]

Mr. Parker testified that, after he was shot, he was "in a state of shock" and that he "played dead." He said that Defendant was unable to unlock the door and called for Co-Defendant Brown to help him. Mr. Parker stated, "[T]hat's when I raised up and I in[-]boxed the other engineer who be up there with me, I told him I'd been shot. Come on, [Co-Defendant Brown] shot me, in case I didn't make it out of there alive they'll know who did it." He continued:

So I got back on the ground playing like I was dead. Both of them came back up the steps. They jumped over me. They started -- I had like the surveillance camera, there's another TV on the wall, and the DVR recording box was on the wall, I just heard everything fall off the wall, and I seen [Co-Defendant Brown] with the TV. He -- both of them . . . jumped over me, and I seen [Co-Defendant Brown] with the TV and the other guy pulled the gun. That's when he -- he shot me. It went through like up there and they ran out. So I waited a while, and I rosed (sic) up and there's another room on the side of my studio. So I limped over there, and I seen the gray Porsche truck that they arrived in, it did a U-turn. They shot back up going towards the Crump precinct.

Mr. Parker testified that Defendant and Co-Defendant took his cell phone and that he was unable to call 9-1-1. He said that a man at a bakery next door called police for him. Mr. Parker testified that Defendant first pulled a gun on him and that the gun was black

with a "beam" on it. He said that Co-Defendant Brown was also armed with a gun. He explained that he heard three gunshots and that he was struck by two of the shots. He said that he still had one bullet "sitting on [his] spine" that was "too dangerous to take out."

Mr. Parker identified the surveillance video from his recording studio taken on the day of the shooting. He also identified both Defendant and Co-Defendant Brown on the video. He said that the two men were inside the building for between five and ten minutes that day. He testified that the video showed Co-Defendant Brown taking a television from the building and Defendant carrying out a rifle belonging to Mr. Parker. Mr. Parker explained that he kept the rifle at the recording studio for protection and denied ever pulling the rifle on Defendant and Co-Defendant Brown; he explained that the rifle "wasn't in the room with us."

Mr. Parker testified that, after the shooting, he was taken to the hospital where he remained for three days. Regarding the gunshot wounds he suffered, Mr. Parker stated that the gunshot wound to his leg "ripped the nerves out [of] . . . [his] leg so it's hard for [him] to stand up a long time[.]" He said that the second gunshot wound that left a bullet "sitting" on his spine caused him severe pain every day. Mr. Parker recalled that he first spoke to an investigator when he was at the hospital and later gave a written statement regarding the shooting while at the police department. He was shown a photographic lineup of potential suspects at the hospital and identified Co-Defendant Brown from the lineup; when identifying Co-Defendant Brown, Mr. Parker wrote, "robbed and shot me three times." Mr. Parker told the detective at the hospital that there had been another individual involved in the shooting along with Co-Defendant Brown but that he did not know the man's name and had never seen him before. Mr. Parker testified that, after he made his formal statement at the police department, he viewed a second photographic lineup and identified Defendant as the second assailant. He said that it took him only three seconds to identify Defendant from the lineup. He circled Defendant's photo and wrote on the document, "The other guy that robbed and shot me."

Mr. Parker stated that, after the shooting, he had to use a wheelchair, walker, and crutches at various times and that he had to learn how to walk again. He said that he never returned to the recording studio after getting out of the hospital and that family members packed up the studio because he was too shaken by the incident. Mr. Parker denied dealing drugs out of the recording studio. He said that there were no scales or baggies at the studio, although he acknowledged that he had a marijuana blunt there that he said was for his personal use.

On cross-examination, Mr. Parker denied that the shooting occurred after a "quarter bag of weed came up short[.]" Mr. Parker testified he informed investigators that both assailants had guns; he said that, when Defendant came back from the bathroom, Defendant

had a "laser pointer gun" pointed at his face and that Co-Defendant Brown pulled out a gun and hit him in the head with it. He said that Co-Defendant Brown's gun looked like a .40 caliber Glock. Mr. Parker recalled that both men told him, "[Y]ou know what time it is[.]" He said that, after Co-Defendant Brown hit him with the gun, he fell to his knees and then Co-Defendant Brown fired two shots at him. Mr. Parker testified that one of the shots went through his leg. He continued:

> I don't know where the other one went, and . . . I fell face forward on the ground. That's when both of them flipped me over, went and took my ID, credit card, bank card, keys, phone, everything, and rolled me back over. And [Defendant] went downstairs trying to unlock the door to get out.

When Mr. Parker was asked if it was his testimony that Defendant shot him, Mr. Parker responded, "Both of them robbed and shot me." He said that Co-Defendant Brown shot him in the leg and that Defendant shot him in the shoulder.

Mr. Parker agreed that he knew Co-Defendant Brown's friend, King Peso, who was another rapper in Memphis. He said he was aware that the gray Porsche truck used by Co-Defendant Brown and Defendant that day belonged to King Peso. He said that he met Co-Defendant Brown through King Peso. Mr. Parker admitted that he had been using marijuana at the recording studio before Defendant and Co-Defendant Brown arrived. He said that, other than this marijuana blunt, he had no other marijuana in the recording studio at the time of the shooting.

Mr. Parker said that he always kept the rifle under the pillows on a couch inside the studio. He identified Defendant on the surveillance video as coming out of the building with a shirt slung over his shoulder carrying what appeared to be a rifle. Mr. Parker denied having an argument with Co-Defendant Brown about marijuana.

MPD Officer Kyle Vlastos testified that, in July 2018, he was working at the Crump Station precinct when he was dispatched to the scene of a shooting at a nearby building on Dudley Street. When he arrived, Officer Vlastos found Mr. Parker sitting on a staircase inside the building suffering from gunshot wounds. Officer Vlastos continued up the stairs past Mr. Parker to check for anyone else inside the building. Upstairs in the recording studio, Officer Vlastos saw blood on the floor and on a chair; he also observed some spent bullet casings on the ground. After confirming that the assailants were no longer at the scene, Officer Vlastos briefly spoke to Mr. Parker about what happened. Mr. Parker said that he did not know who shot him but that he thought the man went by "Goon Carleon."

MPD Officer Newton Morgan testified that, on July 2, 2018, he responded to the scene of the shooting at the recording studio on Dudley Street. Officer Morgan explained

that he worked for the police department as a crime scene investigator and that, when he first arrived, he documented the scene by taking photographs. Officer Morgan also collected several pieces of evidence inside the recording studio, including three bullet casings and a green leafy substance. He said that he collected a 9mm spent cartridge casing from the computer room on the floor and two spent 9mm casings from the recording room. Inside the recording room, Officer Morgan also collected a plastic baggie containing 4.3 grams of marijuana. He said that he did not recover any scales, drug paraphernalia, or additional plastic baggies typically used in drug sales.

Detective Jennifer Robinson of the MPD testified that she was the lead detective in the investigation into the shooting that took place at Mr. Parker's recording studio. While at the scene, Detective Robinson reviewed surveillance footage of the time surrounding the incident, which officers collected as evidence. Detective Robinson then responded to the hospital where she spoke to Mr. Parker. Mr. Parker told Detective Robinson that two assailants robbed him and that he was familiar with one of the suspects because the suspect had recorded music in his studio in the past. Detective Robinson later returned to the hospital with a photographic lineup for Mr. Parker to view. She testified that, when shown the lineup, Mr. Parker positively identified Co-Defendant Brown as one of the assailants. On the form, Mr. Parker wrote: "robbed and shot me three times[.]" Detective Robinson testified that Mr. Parker came to the police department a few weeks after the shooting to provide a formal written statement. She explained that, by this time, she had developed Defendant as a second suspect and that she asked Mr. Parker to view another photographic lineup. She said that, from this lineup, Mr. Parker positively identified Defendant as the second assailant.

On cross-examination, Detective Robinson said that the handguns used in the shooting were never recovered so she had "no direct knowledge or evidence of what specific handguns were used[.]" She explained that the suspects took an assault rifle from the scene that belonged to Mr. Parker that was never recovered. Detective Robinson recalled that Mr. Parker moved out of the recording studio immediately after this incident "in fear of somebody coming back and hurting him again" and that he had family members assist in his moving. Detective Robinson acknowledged that, in her initial conversations with Mr. Parker, she was under the impression that Co-Defendant Brown shot him in both the leg and shoulder. Detective Robinson recalled that Mr. Parker reported cash, a video monitor, and an assault rifle as stolen from him; she said that Mr. Parker did not mention his credit card or debit card being taken. Mr. Parker told Detective Robinson that the assault rifle was taken from under a couch. Regarding the assault rifle, Detective Robinson stated:

> Well, I watched the video, and I saw [Defendant] go in without an assault rifle. I saw him come out with his shirt off with his shirt wrapped

around something with a barrel poking out of it so that's when I put . . . two together, and Mr. Parker said he didn't have his assault rifle anymore.

Special Agent Cervinia Braswell of the TBI testified that she worked as a forensic scientist in the Firearms Identification Unit of the TBI crime laboratory. Agent Braswell testified that, as part of the investigation into Mr. Parker's shooting, she examined three 9mm cartridge cases submitted to the lab. She stated that, based upon her comparative examination, she determined that all three cartridge cases were fired from the same unidentified firearm.

During a break in the trial, the court again addressed the issue of the admissibility of Defendant's prior robbery conviction for impeachment purposes. Defendant argued that "robbery is similar to the crimes for which [he] is currently on trial" and that, "when an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is of course a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence[.]" The State responded that the "claim of unfair prejudice -- prejudicial effect does not outweigh the probative value here. It is a felony. It will go to [the] weight of his testimony as to the credibility of . . . his testimony[.]" The trial court then stated, "All right. It is a . . . weighing process, and it's very careful and . . . it's always easier when – when the felony has nothing to do with the one on trial[.]" The court continued:

> But I think in this instance, the credibility of [Defendant] when he testifies is going to be paramount. The . . . way this case has been defended and . . . tried from the beginning is that Mr. Parker's lying about the whole thing, and it's just, you know, Mr. Parker's made this whole thing up. And I don't have any idea what [Defendant] would testify to, but his version of the events whether they're believable or not is . . . going to be very critical . . . . So I'm going to allow the impeachment, and if -- if he testifies, I will reiterate to the jury, I have a very strong instruction to them that any evidence of other crimes are not . . . something they can consider for the purpose of . . . considering the guilt at hand.

### Defense Proof

Co-Defendant Brown testified that he went by the nickname "Goon Carleon" and that his primary relationship with Mr. Parker was through his use of Mr. Parker's recording studio to record music. Co-Defendant Brown said that, on the day of the shooting, he went to the recording studio to purchase a quarter of an ounce, or seven grams, of marijuana from Mr. Parker. Co-Defendant Brown said that he called Mr. Parker and asked if Mr. Parker had any marijuana for sale. He said that, when he told Mr. Parker how much

- 16 -

marijuana he wanted, Mr. Parker advised that "he had the weed." According to Co-Defendant Brown, Mr. Parker instructed him to call when he arrived at the recording studio. Co-Defendant Brown testified that Defendant was giving him a ride to the recording studio that day and that Defendant did not know why he was going to the studio. He said that they were in a gray Porsche truck. Co-Defendant Brown said that he called Mr. Parker when they arrived at the recording studio and that Mr. Parker came downstairs to let him and Defendant inside the building. Co-Defendant Brown said that Mr. Parker had a handgun hanging out of his pocket and leaned an assault rifle against the wall after he opened the door. He stated that Mr. Parker turned back around, locked the door, and left the keys in the door; Mr. Parker then picked up the assault rifle, and Co-Defendant Brown and Defendant followed him upstairs.

Co-Defendant Brown testified that Mr. Parker placed the assault rifle against a table upstairs and then Defendant asked if he could use the bathroom. Co-Defendant Brown said that he asked Mr. Parker about the marijuana and that he gave Mr. Parker seventy dollars for it. Co-Defendant Brown testified that Mr. Parker handed him the marijuana but that he believed it was not seven grams' worth. He contended that he asked Mr. Parker for the money back but that Mr. Parker told him he could take the amount of marijuana or leave with nothing. According to Co-Defendant Brown, Mr. Parker then put his hand on the handle of the handgun in his pocket. He said that, before Mr. Parker could "pull the gun," he "rushed" Mr. Parker, and the two "got to tussling over the gun." Co-Defendant Brown stated that, as he and Mr. Parker wrestled for control of the gun, the gun fired twice, and Mr. Parker fell to the ground after being shot in the leg. He claimed that Mr. Parker reached for the assault rifle. Co-Defendant Brown explained, "I . . . grabbed like the barrel of the assault rifle and I was trying to tug it up out of his hand. But . . . we [were] tugging it back and forth, then he cocked it." Co-Defendant Brown said that, when Mr. Parker cocked the assault rifle, he shot Mr. Parker in the arm with the handgun. He said that Mr. Parker dropped the rifle and that Defendant, who had returned from the bathroom at this time, picked up the rifle and ran to keep the rifle from Mr. Parker. Co-Defendant Brown testified that he took a monitor on the wall that showed the outside of the building and fled the building in a panic. Co-Defendant Brown denied that he went to the recording studio intending to rob or kill Mr. Parker. According to Co-Defendant Brown, he and Defendant took only the monitor, handgun, and assault rifle from the recording studio.

On cross-examination, Co-Defendant Brown stated that he met Defendant through a mutual friend, King Peso, and that King Peso had asked Defendant to drive him to the recording studio that day. He said that Defendant did not know he was intending to purchase marijuana at the recording studio and that Defendant only came into the building because he needed to use the bathroom. He stated that, after Defendant grabbed the assault rifle, Defendant ran downstairs and did not come back upstairs. Co-Defendant Brown denied taking Mr. Parker's money, keys, or phone and denied going looking under couch

cushions for the assault rifle. He testified that Defendant did not shoot the victim. He testified that he did not get his seventy dollars back from Mr. Parker before leaving the studio and that he left the marijuana behind. Co-Defendant Brown said that he did not remember what happened to the assault rifle after they left the recording studio.

Co-Defendant Brown acknowledged that he pled guilty to aggravated robbery in 2013. He agreed that he was a prominent rapper in Memphis and that he used Mr. Parker's recording studio to record music approximately seven times prior to the shooting. When Co-Defendant Brown was asked about a music video he made, the parties approached the trial court for a bench conference. The State argued that its questions about the music video were relevant because the same vehicle from the surveillance footage from the recording studio appeared in the music video. The State also argued that the music video depicted firearms that matched the description of the gun that Mr. Parker testified was used to shoot him. The trial court ruled that the State could question Co-Defendant Brown about the music video to corroborate the testimony of its witnesses.

The State subsequently asked Co-Defendant Brown if any of his music videos depicted the gray Porsche truck from the surveillance footage, whether Defendant appeared in any of the music videos, and whether they showed Defendant and Co-Defendant Brown with handguns with lasers. Co-Defendant Brown agreed that both the gray Porsche truck and Defendant had appeared in one of his music videos. He acknowledged that he and Defendant had guns in the music video but explained that they were "prop guns." When asked if the music video showed "[h]andguns with lasers[,]" Co-Defendant Brown responded, "Prop guns, prop money, yeah, all that in the video."

Defendant testified that, in July 2018, he was unemployed and lived with his sister. He explained that it had been difficult to find a job because he had pled guilty to robbery in 2013. Defendant said that, on July 2, 2018, he borrowed King Peso's car to run errands for Defendant's grandmother because he did not own a car. He testified that, when he returned to King Peso's residence, King Peso asked him to drive Co-Defendant Brown to Mr. Parker's recording studio. Defendant agreed, and he and Co-Defendant Brown took King Peso's gray Porsche truck to the studio. Defendant testified that, when they arrived, he asked Co-Defendant Brown if he could come inside and use the bathroom. Defendant said that Mr. Parker let them in the front door of the building; Mr. Parker then led them upstairs after grabbing an assault rifle. Defendant recalled that he asked Mr. Parker if he could use the bathroom. Defendant said that he was in the downstairs bathroom for eight or nine minutes, explaining that he "had problems with constipation[.]" He said that he always took his shirt off while using the bathroom and that he took his shirt off that day.

Defendant said that, when he returned upstairs, he heard Co-Defendant Brown saying, "[T]his ain't what it supposed to be . . . get my money back[.]" He testified that

- 18 -

Mr. Parker became angry, grabbed the assault rifle, and aggressively told him and Co-Defendant Brown to "get the f*** out of here." Defendant said that, when Mr. Parker grabbed the rifle, he heard a gunshot. He testified that he looked up and saw a gun in Co-Defendant Brown's hand; he said that he did not know where Co-Defendant Brown got this gun. Defendant stated that Mr. Parker dropped the rifle and was clutching his leg. Defendant testified that he grabbed the rifle and ran downstairs on instinct. According to Defendant, he heard screaming and another gunshot after he ran downstairs. He said that he struggled with the lock and that Co-Defendant Brown later opened the door because Co-Defendant Brown knew how to operate the lock. Defendant said that he carried the rifle wrapped in his shirt under his arm. He denied having to search the studio for the assault rifle. He claimed that, after he took the assault rifle from the building, he put it in the trunk of the gray Porsche truck; he said that he then took the rifle out of the truck and left it on the curb. He said that he covered the rifle with "something" he took from the truck. Defendant denied bringing a weapon to the recording studio or pulling a gun on Mr. Parker. He also denied taking any money, credit or debit cards, or a phone from Mr. Parker. Defendant stated that he was "in fear and panic and confusion at the time" he grabbed the assault rifle. According to Defendant, he did not call 911 after the shooting because he was afraid. He contended that he did not intend to rob or kill Mr. Parker, and he denied shooting Mr. Parker.

During a charge conference, the trial court discussed how it would handle the charge of convicted felon in possession of a firearm in Count Four. The court indicated that it was "bifurcating the format by which we will handle this, and we are removing any references to prior felonies or unlawful acts." The court stated that there would be "a second stage" to the trial, during which the State could present proof and the jury could consider whether the possession of the firearm occurred while Defendant was a felon convicted of a crime whose elements involved the use of violence. The jury instructions regarding Count Four asked the jury to determine whether Defendant was in "possession of a firearm."

Following deliberations, the jury acquitted Defendant of attempted first degree premeditated murder but found him guilty of especially aggravated robbery and employing a firearm during the commission of a dangerous felony.[4] As to Count Four—convicted felon in possession of a firearm—the jury found that Defendant was in possession of a firearm. After the jury announced its verdict, the trial court entered a nolle prosequi on the charge of convicted felon in possession of a firearm in Count Four upon the State's request.[5] The trial court later dismissed the charge of employing a firearm during the commission of a dangerous felony.

---

[4] Co-Defendant Brown was also found guilty of only especially aggravated robbery and employing a firearm in the commission of a dangerous felony.

[5] Defendant did not object to the nolle prosequi, which was entered without costs to Defendant.

- 19 -

At a sentencing hearing, the trial court sentenced Defendant, as a Range I standard offender, to serve twenty years with a one hundred percent release eligibility. Defendant filed a timely motion for new trial and an amended motion for new trial. Following a hearing, the trial court issued a written order denying Defendant's motion. This timely appeal follows.

## Analysis

### *I. Speedy Trial*

Defendant contends that the trial court erred in denying his motion to dismiss for lack of a speedy trial. He asserts that three years, eight months, and four days elapsed between his arrest on September 6, 2018, and the start of his trial on May 10, 2022. Defendant cites, as the reason for the lengthy delay, the trial court's denial of his motion to sever his case from that of Co-Defendant Brown, "the trial court's negligence[,]" and courtroom restrictions imposed by the trial court "without basis in the Tennessee Supreme Court's COVID-19 orders—including the trial court's refusal to try a case with multiple defendants and attorneys without recording any reason why." Defendant contends that he made multiple written and oral requests for a speedy trial beginning in 2019, and he argues that the excessive delay impaired his defense. The State responds that Defendant's right to a speedy trial was not violated.

Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a speedy trial. U.S. Const. amend. VI; Tenn. Const. Art. I § 9. Tennessee also has a statutory right to a speedy trial. *See* Tenn. Code Ann. § 40-14-101 (2018). However, the right to a speedy trial does not arise until the defendant has been arrested or an indictment has been issued. *State v. Baker*, 614 S.W.2d 352, 353 (Tenn. 1981). If the defendant's right to a speedy trial was violated, the only remedy is to dismiss the charges against him. *Barker v. Wingo*, 407 U.S. 514, 522 (1972); *State v. Bishop*, 493 S.W.2d 81, 83 (Tenn. 1973).

In *Barker v. Wingo*, the United States Supreme Court established four factors to be considered when determining whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. Additionally, the Tennessee Supreme Court has stated that the strength of the State's case as to guilt can be used to help judge the four *Barker* factors. *Bishop*, 439 S.W.2d at 85.

A delay approaching one year will trigger a speedy trial analysis, and the presumption that delay has prejudiced the defendant intensifies over time. *Doggett v.*

*United States*, 505 U.S. 647, 652 (1992); *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997). However, courts take into account the complexity of the case in evaluating the reasonableness of the length of delay. *State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996). Further, there may be reasons that justify delay, with different reasons assigned different weight in the balancing analysis. *Barker*, 407 U.S. at 531. Intentional delay to gain a tactical advantage over the defense or delay designed to harass the defendant is weighed heavily against the State. *Id*. Bureaucratic indifference or negligence is also weighed against the State, although not as heavily as deliberate delay. *Id*. Finally, *Barker* listed three areas in which a defendant could suffer prejudice due to a delay: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) impairment of the defense. *Id*. at 532. Of the three, impairment of the defense is the most serious way in which a defendant can be prejudiced. *Id*.

The issue of whether a defendant's constitutional right to a speedy trial has been violated involves "a mixed question of law and fact." *State v. Moon*, 644 S.W.3d 72, 78 (Tenn. 2022). Our standard of review on appeal is "de novo review with respect to whether the court correctly interpreted and applied the law." *Id*. We must "give deference to the trial court's findings of fact unless the evidence preponderates otherwise." *Id*.

## A. Length of Delay

The record shows that Defendant was arrested on September 6, 2018, and that Defendant's trial did not begin until May 10, 2022. The length of the delay from arrest to trial was approximately three years and eight months. Such a delay is sufficient to trigger a speedy trial analysis. *See Utley*, 956 S.W.2d at 494.

## B. Reason for the Delay

The record on appeal contains no information about pretrial proceedings occurring between the time of Defendant's arrest on September 6, 2018, and his indictment on December 4, 2018. The record reflects, however, that following Defendant's arraignment in January 2019, Defendant's case was set for trial but that Defendant requested a continuance until October 7, 2019. Then, a few weeks before his trial, Defendant filed pro se a Motion to Relieve Counsel of Duties, along with several additional pro se motions including a Motion for Continuance. At a status hearing held September 12, 2019, Defendant asserted that he did not want to be represented by defense counsel and that he wanted to represent himself. When the trial court attempted to question Defendant about his decision, however, Defendant refused to answer the court's questions. On his trial date of October 7, 2019, Defendant again requested a continuance to obtain the results of a ballistics test, and the trial court reset the case for trial on December 9, 2019. Thus, this portion of the delay is attributable to Defendant.

The trial court subsequently reset the case—from December 9, 2019 to April 13, 2020—to allow Co-Defendant Brown to receive a mental health evaluation. When resetting the case, the trial court repeatedly emphasized the preference for trying co-defendants together and found that a short delay to allow for the completion of Co-Defendant Brown's mental evaluation would not be unreasonable. The Advisory Commission Comment to Tennessee Rule of Criminal Procedure 8 notes that "[p]ermissive joinder of defendants . . . is aimed at achieving improved judicial economy and efficiency." Tenn. R. Crim. P. 8, Advisory Comm. Cmt. Here, the proof would have been the same for each co-defendant, and separate trials would have required duplicate proof and for witnesses to provide the same testimony on multiple occasions. Therefore, separate trials would have run counter to the objectives of improved judicial economy and efficiency sought under Rule 8.

Defendant contends that the trial court's failure to sign an order for Co-Defendant Brown's mental health evaluation caused a reasonably avoidable delay. From the record, it appears that the failure to order Co-Defendant Brown's evaluation was an inadvertent oversight; nothing in the record suggests that the trial court intentionally declined to enter the order. Upon discovering the oversight, the trial court granted a short continuance to April 13, 2020, while expressing confidence that Co-Defendant Brown would be ready for trial in thirty days. When considering the goal of improving judicial economy and efficiency under Rule 8 of the Tennessee Rules of Criminal Procedure, we conclude that the trial court's short delay was reasonable and did not rise to the level of bureaucratic indifference or negligence. *Barker*, 407 U.S. at 531

As noted by the State, the primary reason for the delay in this case was the COVID-19 global pandemic—a factor beyond the control of the State, the trial court, and Defendant. As set out above, the Tennessee Supreme Court issued multiple orders prohibiting jury trials through March 31, 2021, requiring six feet of distance between persons in the courtroom, and creating "courtroom capacity requirements." Although the Supreme Court's order from May 14, 2021, modified its previous requirement of six feet of distance between persons in the courtroom to a requirement of three feet of distance between persons in the courtroom and lifted previous "courtroom capacity requirements," the order noted that judges "retain[ed] the discretion to limit the number of people in a courtroom as health and safety conditions or circumstances necessitate[.]" When resetting Defendant's trial after March 31, 2021, the trial court repeatedly cited the difficulties in scheduling a trial during the pandemic. On January 10, 2022, when resetting the trial for May 9, 2022, the trial court specifically found that the delay was not the fault of the State or Defendant but was due to the pandemic. The trial court cited the rising infection rates and the small size of its courtroom and explained that May 9 was "the first possible trial date" to safely try Defendant and Co-Defendant Brown. It was not until February 16, 2022,

that the Supreme Court issued an order rescinding the requirement of any certain distance between persons in the courtroom.

A panel of this court has previously observed that "the large majority of courts in other jurisdictions that have addressed a defendant's claim of a violation of his constitutional right to a speedy trial based, in part, on pandemic-related delays have declined to attribute such delays to the State." *State v. Hodge*, No. E2022-00303-CCA-R3-CD, 2023 WL 5472212, at *10 (Tenn. Crim. App. Aug. 24, 2023) (citing *United States v. Keith*, 61 F.4th 839, 853 (10th Cir. 2023) (noting that "no circuit has yet published an opinion classifying delays under the second *Barker* factor," choosing to "treat COVID-19 as a truly neutral justification—not favoring either side," and concluding that "[t]he extenuating circumstances brought about by the pandemic prevented the government from trying [the defendant] in a speedy fashion"); *State v. Adams*, 876 S.E.2d 719, 725 (Ga. App. 2022) (declining to weigh the delay caused by pandemic-related suspension of jury trials against either party); *State v. Paige*, 977 N.W.2d 829, 838 (Minn. 2022) (concluding that "trial delays due to the statewide orders issued in response to the COVID-19 global pandemic do not weigh against the State"); *Ward v. State*, 346 So.3d 868, 871-72 (Miss. 2022) (noting that delays caused by the pandemic are "neutral" and that "unrelated delays occurring during the pandemic may not be neutral and should be considered by the trial court in its analysis"); *Ali v. Commonwealth*, 872 S.E.2d 662, 675 (Va. App. 2022) (holding that pandemic-related delays fell within the third category of delay, "which encompasses 'valid' reasons for delay that are not directly attributable to the government"); *Vlahos v. State*, 518 P.3d 1057, 1072 (Wy. 2022) (determining that delays due to the pandemic are "neutral" because the pandemic was an "extraordinary circumstance" that was not attributable to the State or the defendant); *cf. State v. Labrecque*, No. 22-AP-314, 2023 WL 4381913, at *5-6 (Vt. July 7, 2023) (concluding that "COVID delays are attributable to the State" but that "we will accord those delays very little weight in this case")). Like the previous panel of this court and the majority of other courts that have addressed the issue, we decline to attribute pandemic-related delays to the State or Defendant in light of "[t]he extenuating circumstances brought about by the pandemic." *Keith*, 61 F.4th at 853. Because the delay in this case was attributable first to Defendant and then, with the exception of four months' delay for Co-Defendant Brown's mental evaluation, attributable to the pandemic, we will not weigh this factor in favor of Defendant nor against the State.

## C. Assertion of the Right

The Tennessee and United States Supreme Courts have both recognized that "an accused who is unaware that charges are pending against him or her, as is often the case where an indictment has been sealed and not served, cannot be penalized for his or her failure to assert the speedy trial right." *Wood*, 924 S.W.2d at 347 n.13 (citing *Doggett v. United States*, 505 U.S. 647, 652-54 (1992)). In this case, both parties agree that Defendant

asserted his right to a speedy trial. The record reflects, however, that Defendant was arrested for the offense on September 6, 2018, and he did not assert his right to a speedy trial until December 9, 2019, more than fifteen months after his arrest. During a hearing on December 9, 2019, Defendant verbally asserted his right to a speedy trial, and on February 24, 2020, he filed a written motion asserting his right to a speedy trial. Eighteen days later, the Supreme Court issued its order on March 13, 2020, suspending all in-person courtroom proceedings. *See In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Mar. 13, 2020) (Order). Because Defendant did not assert his right to a speedy trial until over fifteen months after his arrest and because the further delays in his trial were primarily the result of the COVID-19 global pandemic, we conclude that this factor weighs only slightly in favor of Defendant.

### D. Prejudice to Defendant

We must now determine the extent of the prejudice suffered by Defendant as a result of the delay. Of the four *Barker* factors, the most important factor is prejudice to the defendant, and the critical inquiry concerning prejudice "is the impairment of the ability to prepare a defense." *See State v. Vance*, 888 S.W.2d 776, 778 (Tenn. Crim. App. 1994), *overruled on other grounds by State v. Williams*, 977 S.W.2d 101, 105 (Tenn. 1998). However, because it is impossible to prove the usefulness of a witness who has disappeared or is unknown to the defense due to the delay, courts "do not necessarily require a defendant to affirmatively prove particularized prejudice." *Doggett*, 505 U.S. at 655. Furthermore,

> [I]mpairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony "can rarely be shown."
>
> . . .
>
> [E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria, it is part of the mix of relevant facts, and its importance increases with the length of the delay.

*Id.* (citations omitted).

In this case, we cannot say that the delay was so excessive that it presumptively compromised the reliability of Defendant's trial. There was a delay of approximately three years and four months between Defendant's arrest and his trial; however, this period of delay is not necessarily excessive when compared to other cases. *See, e.g., Wood*, 924

- 24 -

S.W.2d at 342 (thirteen-year delay did not result in speedy trial violation); *State v. Vickers*, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997) (finding no speedy trial violation from delay of three years and nine months); *State v. Patton*, No. M2018-01462-CCA-R3-CD, 2020 WL 1320718, at *13 (Tenn. Crim. App. Mar. 19, 2020) (three-year delay did not result in speedy trial violation), *perm. app. denied* (Tenn. Aug. 7, 2020). In our view, the delay in this case was not egregious, given the fact that Defendant's case involved serious charges of attempted first degree premeditated murder, especially aggravated robbery, employing a firearm during the commission of a dangerous felony, and convicted felon in possession of a firearm; Defendant's case involved a co-defendant and multiple witnesses; Defendant did not assert his right to a speedy trial for over fifteen months after his arrest; Defendant requested continuances or otherwise caused much of the early delay in trying his case; and the primary cause of the extended delay thereafter was a global pandemic.

Moreover, nothing in the record indicates that the defense was impaired by the delay of the start of Defendant's trial. In his brief, Defendant contends that, at a minimum, the delay impaired his defense because Mr. Parker had difficulty recalling certain details at trial. A review of the examples cited by Defendant shows that Mr. Parker expressed difficulty remembering conversations that took place in the moments immediately after the shooting and in the hospital due to his injuries. It appears that any difficulties with Mr. Parker's memory stemmed from his recalling conversations that occurred shortly after he was shot multiple times, rather than because of a delay in Defendant's trial date. Moreover, Mr. Parker's testimony was consistent about the identity of the assailants, how he was shot, and the items that were taken during the robbery. Defendant conducted a thorough cross-examination of Mr. Parker at trial, and his suggestion that an earlier trial may have resulted in more favorable testimony from Mr. Parker is wholly speculative. Consequently, we cannot conclude that Defendant has established prejudice based on the delay of his trial. In sum, Defendant has not shown that his right to a speedy trial was violated, and he is not entitled to relief.

## II. Severance from Co-Defendant Brown

Defendant asserts that the trial court erred in denying his Motion for Severance of his case from that of Co-Defendant Brown. He contends that severance was necessary to protect his right to a speedy trial and to promote a fair determination of his guilt or innocence. Defendant argues that the trial court's denial of the Motion for Severance resulted in a violation of his right to a speedy trial. Moreover, he contends that the trial court's order requiring the D.R.T. to accompany Co-Defendant Brown for the entire trial—and the D.R.T. officers' presence immediately behind Defendant throughout the trial—"communicated to the jury that [Defendant] posed a threat and thereby infringed on his presumption of innocence" and that the admission by Co-Defendant Brown that he had been previously convicted of aggravated robbery "exacerbated the undue prejudice" caused

by the admission of Defendant's prior robbery conviction. The State responds that Defendant is not entitled to relief because he has not shown that his right to a speedy trial was violated or that he suffered undue prejudice from the joint trial.

The United States Supreme Court has previously recognized that "[j]oint trials play a vital role in the criminal justice system[.]" *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). Joint trials promote judicial efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id*. at 210. Tennessee Rule of Criminal Procedure 8(c)(3) provides:

> (c) Joinder of Defendants. An indictment, presentment, or information may charge two or more defendants:
>
> . . . .
>
> > (3) even if conspiracy is not charged and all of the defendants are not charged in each count, if the several offenses charged:
> >
> > > (A) were part of a common scheme or plan; or
> > >
> > > (B) were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

Tenn. R. Crim. P. 8(c)(3). As previously noted, the rule of joinder promotes judicial economy and efficiency by encouraging a single trial for offenses arising out of a single criminal episode. Tenn. R. Crim. P. 8, Advisory Comm. Cmts.

However, Tennessee Rule of Criminal Procedure 14 provides that a trial court shall grant a severance of defendants before trial if "the court finds a severance necessary to protect a defendant's right to a speedy trial or appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A). Our supreme court has explained:

> There is no bright-line rule as to when a trial court should grant a defendant's request for severance. Courts consider the following factors, none of which are dispositive, when deciding whether to grant a severance: the number of defendants named in the indictment, the number of counts charged in the indictment, the complexity of the indictment, the estimated length of the trial, the disparities in the evidence offered against the defendants, the disparities in the degrees of involvement by the defendants

- 26 -

in the charged offenses, possible conflicts between the defendants and their strategies, and prejudice from evidence admitted against a co-defendant(s) which is inadmissible or excluded as to another defendant.

When two or more defendants are charged in the same indictment, evidence that is not necessarily applicable to another defendant may be admissible against one or more defendants. A defendant is not entitled to a separate trial merely because damaging proof is introduced against another defendant.

*State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018) (internal citations omitted). Furthermore,

[w]hile "mutually antagonistic" defenses may mandate severance in some circumstances, they are not prejudicial per se. Due to the difficulty in establishing prejudice, relatively few convictions have been reversed for failure to sever on these grounds. Mere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic. The defendant must go further and establish that a joint trial will result in compelling prejudice, against which the trial court cannot protect, so that a fair trial cannot be had.

*State v. Ensley*, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996) (internal citations omitted).

The decision to grant or deny a motion for severance of defendants rests within the sound discretion of the trial court, and we will not disturb the trial court's ruling absent clear abuse of that discretion. *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008). "Where a motion for severance has been denied, the test to be applied by this court in determining whether the trial court abused its discretion is whether the defendant was 'clearly prejudiced' in his defense as a result of being tried with his codefendant[.]" *State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000). The record must demonstrate that "the granting of a severance became a judicial duty" before an accused is entitled to a reversal of his conviction. *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988) (quoting *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969), *vacated on other grounds by Hunter v. Tennessee*, 403 U.S. 711, 712 (1971)).

On appeal, Defendant argues that the trial court's denial of his Motion for Severance resulted in a violation of his right to a speedy trial. As set out *supra*, we have concluded that Defendant was not deprived of his right to a speedy trial. Therefore, Defendant cannot establish based upon this ground that the trial court abused its discretion in denying his Motion for Severance.

Defendant also claims that the denial of his Motion for Severance unfairly prejudiced him and undermined a fair determination of his guilt or innocence. Specifically, Defendant contends that the presence of two D.R.T. officers, who accompanied Co-Defendant Brown throughout the trial, communicated to the jury that Defendant posed a threat and, thereby, infringed on his presumption of innocence. Defendant cites an affidavit attached to his Motion for New Trial, in which defense counsel asserted that two D.R.T. officers "sat directly behind" Defendant and Co-Defendant Brown during trial and that the trial court "never mentioned or attempted to explain the presence of" the D.R.T. officers to the jury.

Initially, we observe that Defendant did not object to the use of the D.R.T. officers at trial; he did not renew his Motion for Severance when the trial court indicated that it would use the D.R.T. officers, and he did not request that the trial court explain the presence of the D.R.T. officers to the jury to lessen any perceived prejudice to Defendant. "The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). Moreover, Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Despite Defendant's failure to take actions reasonably available to him to prevent or nullify the harmful effect of the trial court's ruling, we note that the Supreme Court of the United States has held that the presence of uniformed, armed state troopers seated in the front row of the gallery directly behind the defendant was not inherently prejudicial. *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986). As explained in *Holbrook*, "jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance." *Id*. at 567. The *Holbrook* Court opined that the use of the four troopers did not tend "to brand respondent . . . with an unmistakable mark of guilt" and concluded that "[f]our troopers [were] unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings." *Id*. at 571.

Defendant also claims that the trial court abused its discretion in denying his Motion for Severance because of the admission of Co-Defendant Brown's prior aggravated robbery conviction unfairly prejudiced him and undermined a fair determination of his guilt or innocence. However, a review of the jury instructions shows that the trial court instructed the jury that it was to "give separate consideration to each defendant" and that each defendant was "entitled to have his case decided on the evidence and the law which is applicable to that particular defendant." Furthermore, the trial court instructed the jury that "[a]ny evidence which was limited to a particular defendant should not be considered by you as to any other defendant." The trial court's instructions made it clear that the jury was not to consider Co-Defendant Brown's prior conviction in determining the guilt or

innocence of Defendant, and the jury is presumed to follow the instructions of the trial court. *See Harbison*, 539 S.W.3d at 164.

In this case, there were two co-defendants named in the indictment, and each co-defendant was charged with the same four offenses. There were no disparities in the evidence offered against the co-defendants, other than impeachment evidence of the co-defendants' prior conviction, and no apparent conflicts between the co-defendants' trial strategies. In fact, Co-Defendant Brown's testimony was consistent with Defendant's. Co-Defendant Brown testified that Defendant did not know he was going to the recording studio to purchase marijuana; that Defendant was in the bathroom when the shooting started; that Defendant did not shoot Mr. Parker; that Defendant did not go through Mr. Parker's pockets after the shooting; and that he and Defendant did not go to the recording studio intending to rob and kill Mr. Parker. Under these circumstances, Defendant has not shown that he was clearly prejudiced in his defense as the result of his being tried with Co-Defendant Brown. *See Price*, 46 S.W.3d at 803. Defendant is not entitled to relief on this claim.

### III. Curtailing Defendant's Questions During Voir Dire

Defendant contends that the trial court infringed on his right to an impartial jury when, during voir dire, it curtailed defense counsel's questions about a prospective juror's experience with the criminal justice system, the State's burden of proof, and Defendant's right not to testify. He further contends that the trial court illogically and unreasonably refused defense counsel's request to approach to make a challenge for cause and, instead, rehabilitated a prospective juror who had agreed it would be difficult to acquit Defendant if he did not testify. Defendant argues that the trial court limited his questions "to the point where he could neither discover bases for cause challenges nor intelligently exercise his peremptory strikes." The State responds that the trial court properly exercised its discretion to limit certain lines of questioning during voir dire.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution both guarantee the accused the right to trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. The Tennessee Constitution has been interpreted to guarantee a jury free from "disqualification on account of some bias or partiality toward one side or the other of the litigation." *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003) (quoting *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993)). Bias is "a leaning of the mind; propensity or prepossession towards an object or view, not leaving the mind indifferent; a bent; for inclination." *Id.* "The ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial

court." *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993) (citing *State v. Harris*, 839 S.W.2d 54, 65 (Tenn. 1992); *State v. Simon*, 635 S.W.2d 498, 508 (Tenn. 1982)).

A trial court's decisions regarding juror qualifications are reviewed for an abuse of discretion. *State v. Hugueley*, 185 S.W.3d 356, 378 (Tenn. 2006); *State v. Mickens*, 123 S.W.3d 355, 375 (Tenn. Crim. App. 2003). The trial court's decision will not be reversed absent "manifest error." *Howell*, 868 S.W.2d at 248. On appeal, this court must determine "whether the jury that tried the case was fair and impartial." *State v. Davidson*, 509 S.W.3d 156, 193 (Tenn. 2016).

Peremptory challenges are intended to exclude jurors "suspected of bias or prejudice," while the challenge for cause should be used to exclude potential jurors "whose bias or prejudice rendered them unfit." *State v. Pamplin*, 138 S.W.3d 283, 285-86 (Tenn. Crim. App. 2003) (quoting *Manning v. State*, 292 S.W. 451, 455 (Tenn. 1927)) (internal quotation marks omitted). Tennessee Rule of Criminal Procedure 24(b) provides that the trial court "may ask potential jurors appropriate questions regarding their qualifications to serve as jurors in the case" and "shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges." Tenn. R. Crim. P. 24(b)(1). Additionally, "[o]n motion of a party or its own initiative, the court may direct that any portion of the questioning of a prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors." Tenn. R. Crim. P. 24(b)(2).

The Tennessee Rules of Criminal Procedure also sets forth the following procedure for challenges for cause:

> After examination of any juror, the judge shall excuse that juror from the trial of the case if the court is of the opinion that there are grounds for challenge for cause. After the court has tentatively determined that the jury meets the prescribed qualifications, counsel may conduct further examination and, alternately, may exercise challenges for cause.

Tenn. R. Crim. P. 24(c)(1). "Any party may challenge a prospective juror for cause if: . . . [t]here exists any ground for challenge for cause provided by law" or "[t]he prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror." Tenn. R. Crim. P. 24(c)(2)(A)-(B). In determining whether a prospective juror has been exposed to potentially prejudicial information, the trial court "shall consider both the degree of exposure and the prospective juror's testimony as to his or her state of mind." Tenn. R. Crim. P. 24(c)(2)(B). "A prospective juror who states that he or she will be unable to overcome preconceptions is subject to challenge for cause no matter how slight the exposure." *Id*.

If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability depends on whether the court believes the testimony as to impartiality. A prospective juror who admits to having formed an opinion about the case is subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

*Id*. "Jurors need not be totally ignorant of the facts of the case on which they sit [and] [e]ven the formation of an opinion on the merits will not disqualify a juror if [he] can lay aside [his] opinion and render a verdict based on the evidence presented in court." *Howell*, 868 S.W.2d at 249 (quoting *State v. Sammons*, 656 S.W.2d 862, 869 (Tenn. Crim. App. 1982)). "An individual examined during voir dire is not required to have a complete lack of knowledge of the facts and issues to be selected as a juror." *State v. Davidson*, 121 S.W.3d 600, 612 (Tenn. 2003). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *see also State v. Mann*, 959 S.W.2d 503, 531 (Tenn. 1997).

In this case, the trial court properly exercised its discretion to control voir dire. First, the record reflects that defense counsel's questions to Mr. Bullard—about whether police apprehended Mr. Bullard's assailant and whether Mr. Bullard participated in the prosecution—far exceeded counsel's initial question of whether potential jurors had an experience where they felt in fear for their lives. The trial court reasonably limited defense counsel's further questions of Mr. Bullard on the subject because the court did not want to present the potential jurors with lengthy descriptions of experiences in other criminal cases. We further conclude that, after Ms. Parks expressed apprehension about acquitting Defendant if he did not testify, the trial court properly provided an instruction to Ms. Parks and the other potential jurors about why the jury could not draw a negative inference if Defendant did not testify. The court also properly explained that the State had the burden of proving every element of the offenses, and it did not abuse its discretion by asking if Ms. Parks could be fair and follow the applicable law. Moreover, we note that Defendant exercised peremptory challenges against Mr. Bullard and Ms. Parks and that neither served on the jury.

Under these circumstances, Defendant has not shown that the trial court abused its discretion during voir dire, that the trial court's actions prohibited him from intelligently exercising his peremptory challenges, or that he was denied the right to a fair and impartial jury. He is not entitled to relief.

- 31 -

*IV. Cross-Examining Mr. Parker Regarding Prior Cases*

Next, Defendant contends that the trial court unreasonably restricted his right to cross-examine a witness against him when the court denied his request to cross-examine Mr. Parker about Mr. Parker's criminal charges that the State dismissed prior to Defendant's trial. Defendant asserts that his cross-examination of Mr. Parker on this subject would have revealed "potential bias" critical to the jury's determination of the credibility of Mr. Parker's testimony. The State responds that the trial court properly limited Defendant's requested cross-examination because Defendant failed to show that the line of inquiry was relevant to establishing Mr. Parker's alleged bias.

A defendant's constitutional right to confront the witnesses includes the right to conduct meaningful cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987); *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000). The denial of a defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318 (1974)). A defendant's right to confront witnesses does not preclude a trial court from imposing limits upon the cross-examination of witnesses, taking into account such factors as "harassment, prejudice, issue confusion, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994); *see also* Tenn. R. Evid. 611(a) (stating that the trial court has authority to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel"). However, proof suggesting that a witness received or had reason to expect leniency from the State typically constitutes relevant evidence of bias. *See State v. Smith*, 893 S.W.2d 908, 924 (Tenn. 1994); *see also United States v. Abel*, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.").

"The propriety, scope, manner and control of the cross-examination of witnesses . . . rests within the discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995) (citing *Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948); *Davis v. State*, 212 S.W.2d 374, 375 (Tenn. 1948)). Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses. *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984) (citing *Monts v. State*, 379 S.W.2d 34 (Tenn. 1964)).

Here, the record reflects that the trial court heard Defendant's Motion in Limine to Allow Cross-Examination on Alleged Victim's Prior Dismissed Cases on the morning of

- 32 -

trial but that the hearing took place off the record. Consequently, it is unclear whether any evidence, or an offer of proof, was presented to the trial court on this issue, and the record does not reflect the basis for the trial court's determination that the dismissed cases were not "impeachment material." As noted by the State, "[t]his [c]ourt has repeatedly discouraged 'off-the-record' discussions concerning matters of significance in criminal proceedings because such discussions may preclude appropriate appellate review." *State v. Byrd*, No. E2013-00365-CCA-R3-CD, 2014 WL 545451, at *4 (Tenn. Crim. App. Feb. 10, 2014), *perm. app. denied* (Tenn. Aug. 26, 2014). The defendant bears the burden of preparing an adequate record for appeal, *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), and in the absence of a complete record, this court must presume that the trial court's ruling was correct. *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Because of the lack of an adequate record as to this issue, we must presume that the trial court correctly denied Defendant's Motion in Limine to Allow Cross-Examination on Alleged Victim's Prior Dismissed Cases.

Defendant has not shown that the trial court abused its discretion by limiting his cross-examination of Mr. Parker or that the court's ruling violated his right to confront and cross-examine the witness. He is not entitled to relief on this claim.

*V. Admission of Defendant's Prior Robbery Conviction*

Defendant argues that the trial court erred in admitting his prior robbery conviction under Tennessee Rule of Evidence 609 and that the error was not harmless. Defendant contends that the trial court admitted the prior conviction without explaining how the robbery conviction was relevant to his credibility or determining whether the "conviction's probative value on credibility outweighed its unfair prejudicial effect on the substantive issues." Defendant avers that because the impeaching conviction was "nearly identical" to the crime for which Defendant was on trial, the danger of unfair prejudice was great. The State responds that the trial court did not abuse its discretion by ruling that Defendant's prior robbery conviction was admissible as impeachment evidence.

Rule 609(a) of the Tennessee Rules of Evidence provides:

For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:

(1) The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction may be established by public record. If the witness

denies being the person named in the public record, identity may be established by other evidence.

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 609(a).

"Robbery is a crime involving dishonesty and may be used for impeachment purposes." *State v. Galmore*, 994 S.W.2d 120, 122 (Tenn. 1999); *see also State v. Pyburn*, No. M2003-01090-CCA-R3-CD, 2004 WL 1857109, at *12 (Tenn. Crim. App. Aug. 16, 2004) (concluding that the defendant's "credibility was a key issue at trial" and that the defendant's previous conviction for aggravated robbery "was probative of his credibility"), *perm. app. denied* (Tenn. Dec. 20, 2004).

"The mere fact a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness." *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (citing *State v. Miller*, 737 S.W.2d 556, 560 (Tenn. Crim. App. 1987)). Two criteria are especially relevant in determining whether the probative value of a conviction on the issue of credibility outweighs its unfair prejudicial effect upon the substantive issues: (1) the impeaching conviction's relevance as to credibility; and (2) the impeaching conviction's similarity to the charged offense. *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). We review a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. *State v. Waller*, 118 S.W.3d 368, (Tenn. 2003) (citing *Mixon*, 983 S.W.2d at 675; *State v. Blanton*, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996)).

In this case, the trial court did not abuse its discretion by permitting the use of Defendant's prior robbery conviction as impeachment evidence. The record reflects that the State gave Defendant reasonable written notice of the impeaching conviction before trial and that the trial court properly found that the conviction was a felony and a crime involving dishonesty. *Galmore*, 994 S.W.2d at 122. The trial court further found that, although a prior robbery conviction was similar to the offenses for which Defendant was on trial, the conviction's probative value on Defendant's credibility outweighed its unfair prejudicial effect, reasoning that the issue of Defendant's credibility was "going to be paramount" because the theory of defense was that Mr. Parker was "lying about the whole thing." Finally, as noted by the State, the trial court instructed the jury that it could only consider Defendant's prior conviction for the "purpose of its effect, if any, on [his] credibility as a witness" and that it could not be considered as evidence of Defendant's guilt for the offenses for which he was on trial. The jury is presumed to have followed the instructions of the trial court, and Defendant has not presented any evidence to the contrary. *See Harbison*, 539 S.W.3d at 164. Defendant is not entitled to relief on this claim.

### *VI. Allowing the State to Question Co-Defendant Brown Regarding the Music Video*

Defendant asserts that the trial court erred in allowing the State to cross-examine Co-Defendant Brown about the rap music video in which Defendant and Co-Defendant Brown appeared. Defendant argues that the music video was not relevant because: "there was no basis for believing that its contents were rooted in reality"; there was no "nexus between specific details of the music video and the circumstances of the offense for which [Defendant] was charged"; and Defendant and Co-Defendant Brown "readily admitted they were present for the incident." Defendant also asserts that, even if the music video was relevant, its probative value was substantially outweighed by the danger of undue prejudice. Finally, Defendant argues that evidence of his appearance in Co-Defendant Brown's music video was prohibited by Tennessee Rule of Evidence 404(b). The State responds that the trial court did not abuse its discretion by allowing the State to cross-examine Co-Defendant Brown about the music video.

When a trial court makes an evidentiary ruling, the appropriate standard of review on direct appeal is "whether the record clearly demonstrates that the trial court abused its discretion" in ruling on the admissibility of the evidence. *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citing *Regions Bank v. Thomas*, 532 S.W.3d 330, 336 (Tenn. 2017); *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015)). In *McCaleb*, our supreme court explained:

> We emphasize that the abuse of discretion standard of review does not permit an appellate court to substitute its judgment for that of the trial court. *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018). Rather, "[b]ecause,

by their very nature, discretionary decisions involve a choice among acceptable alternatives, reviewing courts will not second-guess a trial court's exercise of its discretion simply because the trial court chose an alternative that the appellate courts would not have chosen." *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Accordingly, if the reviewing court determines that "reasonable minds can disagree with the propriety of the decision," the decision should be affirmed. *Harbison*, 539 S.W.3d at 159.

*Id.*

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible. Tenn. R. Evid. 402. However, it may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice[.]" Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978).

Here, the trial court did not abuse its discretion in determining that evidence of Defendant's appearance in Co-Defendant Brown's music video was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice. As found by the trial court, evidence that Co-Defendant Brown and Defendant had access to the gray Porsche truck found in the surveillance footage and to a gun with a laser sight was probative of the fact that Co-Defendant Brown and Defendant utilized those items in the robbery. The evidence also corroborated Mr. Parker's testimony that Defendant had a gun with a laser sight. We note that the State's questions regarding the music video were limited and that the video was not played for the jury. Defendant has not shown that any danger of unfair prejudice substantially outweighed the probative value of this evidence.

"Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). However, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). Under Tennessee Rule of Evidence 404(b), the evidence must be excluded "if its probative value is outweighed by the danger of unfair prejudice." Tenn. R. Evid. 404(b)(4).

As noted by the State, evidence that someone possessed a firearm is not evidence of a prior bad act as contemplated by Rule 404(b). *State v. Clark*, 452 S.W.3d 268, 289 (Tenn. 2014); *State v. Robinson*, No. M2016-02335-CCA-R3-CD, 2017 WL 4693999, at *7

(Tenn. Crim. App. Oct. 18, 2017) (concluding that a photograph of the defendant holding two handguns did not implicate Rule 404(b)), *perm. app. denied* (Tenn. Feb. 14, 2018). Therefore, Co-Defendant Brown's testimony that Defendant appeared with him in the music video holding a prop gun did not implicate Rule 404(b). Defendant is not entitled to relief.

## VII. Failure to Fully Bifurcate the Charge of Convicted Felon in Possession of a Firearm

Defendant also contends that the trial court erred by failing to bifurcate the charge of being a convicted felon in possession of a firearm in Count Four from the remaining charges. Defendant avers that, instead of properly bifurcating the charge, the trial court employed a procedure that charged Defendant "with an offense that did not exist" and deprived him of the ability to argue an available statutory defense. The State responds that Defendant is not entitled to relief because the State entered a nolle prosequi on the charge.

A nolle prosequi is a formal entry upon the record by "the prosecuting officer in a criminal action, by which he declares that he will no further prosecute the case, either as to some of the counts . . . or altogether." *State v. D'Anna*, 506 S.W.2d 200, 202 (Tenn. Crim. App. 1973) (citing *State ex rel. Underwood v. Brown*, 244 S.W.2d 168 (Tenn. 1951)). "When an unconditional order [n]olle prosequi is entered after indictment, it is a dismissal of the indictment and no conviction can be had except by beginning a new case against the accused." *Id.* (citing *State ex rel. Hobbs v. Murrell*, 93 S.W.2d 628 (Tenn. 1936)); *see also State v. Neely*, 1 S.W.3d 679, 682 (Tenn. Crim. App. 1999).[6]

Because the charge of convicted felon in possession of a firearm was dismissed when the State requested a nolle prosequi, there is no judgment of conviction from which Defendant can appeal pursuant to Rule 3(b). *See* Tenn. R. App. P. 3(b); *Homolko v. State*, 295 S.W. 66, 67 (Tenn. 1927) ("No appeal lies from a nolle prosequi."); *State v. Childress*, 298 S.W.3d 184, 186 (Tenn. Crim. App. 2009) (holding that a defendant cannot appeal from an order allowing the State to nolle prosequi the charges against him). Because of the unavailability of a Rule 3 appeal from the entry of a nolle prosequi, we conclude that this court is without jurisdiction to consider the propriety of the procedure employed by the trial court as to the charge of convicted felon in possession of a firearm in Count Four. Because Defendant does not stand convicted of the offense in Count Four, this court has no jurisdiction to address Defendant's claim.

---

[6] We note that Defendant was put in jeopardy before the nolle prosequi was entered; thus, a subsequent prosecution of Defendant for the offense charged in Count Four would be barred by double jeopardy considerations. *See State v. Moore*, 713 S.W.2d 670, 674-75 (Tenn. Crim. App. 1985).

## VIII. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to support his conviction. He argues that Mr. Parker's testimony was contradictory and not credible and that the State did not prove that his use of violence or fear preceded or was contemporaneous with the taking of Mr. Parker's property. The State responds that the evidence is sufficient to sustain Defendant's conviction for especially aggravated robbery.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

"Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2018). Especially aggravated robbery is robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (2018). "Serious bodily injury" is defined as bodily injury that involves: a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; protracted loss or substantial impairment of function of a bodily member, organ or mental faculty; or a broken bone of a child who is twelve (12) years of age or less. Tenn. Code Ann. § 39-11-106(a)(34) (2018). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2) (2018). The subjective nature of pain is a fact to be determined by the trier of fact. *State v. Dedmon*, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), *no perm. app. filed*.

In this case, the trial court instructed the jury on criminal responsibility. A person is criminally responsible for an offense committed by the conduct of another, if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2018).

Viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's conviction for especially aggravated robbery. The evidence at trial established that on July 2, 2018, Defendant and Co-Defendant Brown arrived at Mr. Parker's studio under the pretense of Co-Defendant Brown's using the studio for an hour of recording time. After Mr. Parker let them inside and took them upstairs, Defendant excused himself to the bathroom. Minutes later, Defendant returned to the recording studio pointing a gun with a laser sight at Mr. Parker. Defendant told Mr. Parker, "[N]***a, you know what time it is." At the same time, Co-Defendant Brown pulled a gun out and hit Mr. Parker across the head with it. Co-Defendant Brown also told Mr. Parker, "[Y]ou know what time it is[.]" When Mr. Parker fell to his knees, Co-Defendant Brown fired the gun at him twice, hitting Mr. Parker in the leg. Then, Defendant and Co-Defendant Brown flipped Mr. Parker over, went through his pockets, and took money, a credit card, a bank card, and Mr. Parker's keys and phone. Co-Defendant Brown then attempted to find the digital recording box for the surveillance system set up outside the recording studio as Mr. Parker "played dead" and Defendant fled down the stairs. Mr. Parker testified that Co-Defendant Brown pulled items off the wall, including a television. He said that Defendant was unable to unlock the door and called for Co-Defendant Brown to help him. He said that, when Defendant and Co-Defendant returned upstairs, Defendant "pulled the gun" and shot him.

Through Mr. Parker's testimony, the State introduced a surveillance video that showed Co-Defendant Brown's taking a television from Mr. Parker's recording studio and Defendant's taking the assault rifle, which Defendant wrapped up in his shirt. After the shooting, Mr. Parker was taken to the hospital where he remained for three days. Regarding his wounds, Mr. Parker stated that the gunshot wound to his leg "ripped the nerves out [of] . . . [his] leg so it's hard for [him] to stand up a long time[.]" He said that the second gunshot wound that left a bullet "sitting" on his spine caused him severe pain every day. Mr. Parker identified both Defendant and Co-Defendant Brown in photographic lineups, on the surveillance video, and in court. When Mr. Parker was asked if it was his testimony that Defendant shot him, Mr. Parker responded, "Both of them robbed and shot me." He said that Co-Defendant Brown shot him in the leg and that Defendant shot him in the shoulder.

Although Defendant argues that Mr. Parker's testimony was contradictory and not credible, he acknowledges that it was the role of the jury to resolve questions of witness credibility. Based upon its verdict, the jury clearly accredited Mr. Parker's testimony over

the testimony from Defendant and Co-Defendant Brown, as it was entitled to do. As previously stated, questions of fact, the credibility of witnesses, and the weight of the evidence are resolved by the fact finder, and this court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659; *see also State v. Hooper*, No. W2021-01069-CCA-R3-CD, 2022 WL 2718863, at *4 (Tenn. Crim. App. July 13, 2022) (stating that this court will "not entertain questions concerning the credibility of a witness because those are matters entrusted to the jury"), *no perm. app. filed*. Any alleged inconsistencies in Mr. Parker's testimony do not render the evidence insufficient to sustain Defendant's conviction.

Defendant also contends that the State failed to prove that the use of violence or fear preceded or was contemporaneous with the taking of the items from Mr. Parker. However, Mr. Parker testified that Defendant pointed a gun at him and told him he "knew what time it [was]" and that Co-Defendant Brown hit him with a gun and then shot him. Mr. Parker stated that both assailants then flipped him over and removed items from his pockets. The evidence clearly showed that the use of violence or fear preceded the taking of the victim's property. Accordingly, the evidence is sufficient for any rational trier of fact to find Defendant guilty of especially aggravated robbery beyond a reasonable doubt. Defendant is not entitled to relief.

## Conclusion

Based on the foregoing, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE